AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Disclosure of Location-Based Services for AT&T Cellular Telephone Number (202) 294-2304 | ) ) ) |

OCT 1 1 2017

Case No. 1:17sw685

## UNDER SEAL

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Facilities belonging to service provider T-Mobile associated with cellular telephone number (202) 294-2304. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(a) and Fed. Rule of Crim. P. 41.

located in the _____Unknown_____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

Disclosure of location-based electronic communications data for AT&T cellular telephone number (202) 294-2304.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute cocaine and heroin. |

The application is based on these facts:
See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Jonathan Boller_
*Applicant's signature*

Jonathan C. Boller, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __10/11/17__

/s/ MN
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

Hon. Michael S. Nachmanoff, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

OCT 1 1 2017

IN THE MATTER OF THE APPLICATION OF
THE UNITED STATES OF AMERICA FOR A
SEARCH WARRANT AND ORDER
PURSUANT TO 18 U.S.C. § 2703(c)(1)(A)
FOR: (1) THE CONTINUED DISCLOSURE
OF LOCATION BASED SERVICES; AND
(2) DISCLOSURE OF STORED
COMMUNICATIONS RECORDS FOR
TELEPHONE NUMBER (202) 294-2304

**UNDER SEAL**

1:17-sw-685

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jonathan C. Boller, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is submitted in support of an application for the continued

disclosure of location-based electronic communications data for a cellular telephone number

**(202) 294-2304** (as defined in the Application and hereinafter referred to as the "SUBJECT

TELEPHONE NUMBER"), pursuant to Federal Rule of Criminal Procedure 41(d)(1) and Title

18, United States Code, Sections 2703(c).  The SUBJECT TELEPHONE NUMBER is serviced

by AT&T and is used by RASHOURN NILES.  As set forth in greater detail below, I believe

there is probable cause to support the determination that NILES is a member of a conspiracy to

distribute cocaine, heroin, and other controlled substances and that members of the conspiracy

have distributed firearms, cocaine, and heroin within the Eastern District of Virginia and

elsewhere.  Further, I submit there is probable cause to support the determination that NILES

continues to use the SUBJECT TELEPHONE NUMBER to conduct narcotics trafficking.

2.     This affidavit does not contain every fact known to me regarding this investigation, but rather contains information necessary to demonstrate probable cause in support of the above-referenced search warrant. In addition, I set forth the following facts showing that there are sufficient grounds to believe that the disclosure of location-based services and the installation of a pen register and trap and trace device on the SUBJECT TELEPHONE NUMBER, will be relevant and material to an ongoing criminal investigation.

3.     The facts and information contained in this affidavit are based on my personal knowledge and information obtained from federal and state law enforcement officers. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s).

4.     I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since 2016. I have experience investigating narcotics and firearms trafficking offenses.

5.     As an ATF Special Agent, I have investigated and assisted in the investigation of narcotics and firearms traffickers. I have previously participated in investigations, which resulted in the arrest and conviction of narcotics and firearms traffickers. I have also become familiar with the methods and techniques associated with the distribution of narcotics and how drug trafficking organizations work. From 2014 to 2016, I served as a Special Agent with the United States Secret Service, where I received specialized training including certification in the Basic Investigation of Computer and Electronic Crimes Program.

6.     I have participated in the investigation of the offenses set forth below. The facts and information contained in this affidavit are based upon my personal knowledge, information

2

obtained from federal and local law enforcement officers, and information obtained from interviews and analysis of reports.

7.      This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each fact and matter observed by me or known to the government.

## PROBABLE CAUSE

A.      Background on the Investigation

8.      In February of 2017, a cooperating source ("CI-1") reported to the Prince William County Police Department Street Crimes Unit that an individual ("Co-Conspirator 1") was a narcotics distributor. CI-1 stated that Co-Conspirator 1's source of supply is his stepfather, RASHOURN NILES.

9.      CI-1 and Co-Conspirator 1 are members of the Imperial Gangster Blood (IGB) gang. CI-1 will be referred to in the masculine gender, regardless of CI-1's true gender. CI-1 has been convicted of two felonies, including robbery and a probation violation. He was arrested in December of 2016, in Prince George's County, Maryland, for possessing a stolen firearm as a convicted felon and possession of controlled substances.

10.     Based on this information and because Co-Conspirator 1 is a known member of the Imperial Gangster Blood gang, ATF opened an investigation into co-conspirator 1.

B.      Purchase of MDMA on March 11, 2017

11.     On March 8, 2017, CI-1 reported to law enforcement that there would be an IGB gang meeting on March 11, 2017. CI-1 reported Co-Conspirator 1 would be at the meeting and that he would be able to purchase cocaine from Co-Conspirator 1. On March 11, 2017, the

meeting took place at the Hilton Garden Inn located on Neabsco Common Place, Woodbridge, Virginia, which is within the Eastern District of Virginia.

12.     Prior to the meeting, CI-1 rented the hotel room for the meeting and granted ATF access to place audio/video recorders in the room. Based on my review of the recording, I believe CI-1's description of the events and conversations at the gang meeting was accurate.

13.     Prior to the gang meeting, CI-1 met with law enforcement officers. ATF special agents searched CI-1 and his vehicle for contraband with negative results. Agents then provided CI-1 with ATF agent cashier funds to purchase cocaine and/or a firearm from Co-Conspirator 1 and/or other co-conspirators. An audio recorder was also placed on CI-1's person.

14.     Law enforcement then followed CI-1 to the hotel. During the trip, CI-1 had a FaceTime conversation with Co-Conspirator 1, who reported that he (Co-Conspirator 1) would meet CI-1 at the hotel. Shortly thereafter, law enforcement observed Co-Conspirator 1 arrive at the hotel.

15.     Later that evening, CI-1 and Co-Conspirator 1 left the hotel in CI-1's vehicle. Law enforcement followed CI-1 from the hotel to a store on Worth Avenue. CI-1 stated that Co-Conspirator 1 called his molly source of supply and that Co-Conspirator 1 was told to meet at that location. While CI-1 and Co-Conspirator 1 were waiting in the vehicle, an individual approached CI-1's vehicle and leaned through the open window to speak with Co-Conspirator 1. CI-1 positively identified RASHOURN NILES from a DMV photograph, as being the individual who leaned through CI-1's window to speak with Co-Conspirator 1. NILES made a statement to Co-Conspirator 1 to the effect of "you know what I drive," followed by a description of where his vehicle was parked within the parking lot. CI-1 drove Co-Conspirator 1 to the specified

4

location where Co-Conspirator 1 entered NILES vehicle, retrieved an unknown quantity of molly, and left cash payment for the molly within the vehicle.

      C.      Controlled Purchase of Cocaine from Co-Conspirator 1 on March 23, 2017

      16.      On March 23, 2017, CI-1 contacted Co-Conspirator 1 via FaceTime. Co-Conspirator 1 was using account borntowin88@icloud.com, which CI-1 identified as an account used by Co-Conspirator 1.

      17.    At law enforcement direction, CI-1 ordered two (2) ounces of cocaine from Co-Conspirator 1. Co-Conspirator 1 agreed to sell the cocaine for $2,600. During this conversation, CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 along with his vehicle and found it to be free of illegal items. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

      18.      When CI-1 arrived at the location, Co-Conspirator 1 instructed CI-1 to enter his (Co-Conspirator 1's) vehicle. Prior to CI-1's arrival a surveillance team observed Co-Conspirator 1 meet with an adult black male who arrived and departed in a vehicle known to be operated by NILES. This meeting took place immediately prior to CI-1's arrival at the same location where CI-1 was instructed to meet Co-Conspirator 1. Law enforcement observed Co-Conspirator 1 and CI-1 drive away. While in the car, Co-Conspirator 1 discussed recent ounce-level drug deals he made to two additional co-conspirators.

      19.      Law enforcement followed Co-Conspirator 1's vehicle to the area of Bellona Road, Woodbridge, Virginia. Law enforcement observed Co-Conspirator 1 and CI-1 exit the vehicle and enter an apartment. According to CI-1, once inside, Co-Conspirator 1 made a

statement to the effect "I just met my stepfather right there, he just brought this shit to me just now because I had run out" (NILES is Co-Conspirator 1's stepfather). Further, I can confirm that Co-Conspirator 1 is recorded saying this on the audio recording.

20.    Co-Conspirator 1 then retrieved a bag of cocaine from underneath his clothing. Co-Conspirator 1 informed CI-1 that he had a little over two (2) ounces of cocaine and CI-1 agreed to purchase the cocaine and provided Co-Conspirator 1 with $2,600. Co-Conspirator 1 weighed out two (2) ounces, packaged it, and provided it to CI-1. Co-Conspirator 1 then took the remainder of the cocaine and secured it underneath his clothing.

D.    Controlled Purchase of Cocaine from Co-Conspirator 1 on March 30, 2017

21.    In the days leading up to March 30, 2017, CI-1, at law enforcement direction, arranged to purchase a "four deuce" (4.5 ounces) of cocaine from Co-Conspirator 1. Co-Conspirator 1 agreed to sell the cocaine for $5,400. CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds to conduct the controlled purchase. The controlled purchase was also audio recorded.

22.    While inside the location where the transaction took place, CI-1 stated that Co-Conspirator 1 appeared to become confused at how much cocaine he should have left after making a series of previous sales. According to CI-1, Co-Conspirator 1 then placed a phone call to NILES. Co-Conspirator 1 began the phone call by stating "What you say that joint was you gave me before?" Co-Conspirator 1 paused then asked, "You sure bro?" Co-Conspirator 1 then paused again, stated several words that are not immediately intelligible, and stated, "That don't add up to no god damn 6." Co-Conspirator 1 then ran through the addition of a group of

numbers, and made a statement that appeared to suggest Co-Conspirator 1 did not think the amount remaining and the amount he had previously sold added up to the amount he was charged with purchasing. Co-Conspirator 1 added up numbers out loud leading to a total of "161" (161 grams is equal to 5.75 ounces). Toll records from Co-Conspirator 1's phone number during this time frame show 5 phone calls between (703) 226-9912 (a phone number that has been previously identified as being used by Co-Conspirator 1) and (202) 899-0228 (this number was later identified to belong to NILES).

E.      Controlled Purchase of Cocaine from Co-Conspirator 1 on April 6, 2017

23.      In the days leading up to April 6, 2017 CI-1, at law enforcement direction, arranged to purchase two (2) ounces of "crack" cocaine and one (1) ounce of powder cocaine from Co-Conspirator 1. Co-Conspirator 1 agreed to sell the cocaine for approximately $5,000 (the actual final cost was $4,900). CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds, as well as audio recording and transmitting device(s) to conduct the controlled purchase.

24.      After meeting with Co-Conspirator 1, CI-1 and Co-Conspirator 1 traveled to a location in Prince William County where the transaction was to take place. While inside this location, in the presence of CI-1, an adult resident of that location, and several small children, Co-Conspirator 1 began manufacturing crack cocaine. According to CI-1, at some point during this process, Co-Conspirator 1, worried about the quality of his cooking and called NILES to seek guidance. Law enforcement has reviewed the audio recordings and I can confirm that I hear background noises consistent with cooking crack cocaine, including the use of a microwave and

mixing items in a glass container. After a period of time Co-Conspirator 1 can be heard calling someone and speaking to a subject believed to be NILES. According to Co-Conspirator 1's toll records, several phone calls were placed during this time period to (202) 899-0228.

25.     Approximately 25 minutes after CI-1 purchased the crack cocaine and left Co-Conspirator 1, Co-Conspirator 1 placed a phone call to (202) 899-0228. Approximately 14 minutes later, both Co-Conspirator 1's vehicle and the NILES vehicle were observed parked, unoccupied, in front of a residence within Prince William County, Virginia. The mother of Co-Conspirator-1's children resides at this residence, NILES does not reside here.

F.  Controlled Purchase of Heroin from NILES on April 26, 2017

26.     In the days leading up to April 26, 2017, CI-1, at law enforcement direction, arranged to purchase two (2) ounces of "crack" cocaine and one (1) ounce of powder cocaine from Co-Conspirator 1. Prior to the transaction taking place, Co-Conspirator 1 reported to CI-1 that he was "dry" (out of cocaine). CI-1 also discussed purchasing heroin through Co-Conspirator 2 via Co-Conspirator 1. CI-1 and Co-Conspirator 1 agreed to meet at a location in the Eastern District of Virginia to conduct the transaction. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds, as well as audio and video recording and transmitting device(s) to conduct the controlled purchase.

27.     After meeting with Co-Conspirator 1, CI-1 and Co-Conspirator 1 traveled to a location in Prince William County and picked up Co-Conspirator 2. They travelled to an area restaurant and Co-Conspirator 2 agreed to sell heroin to CI-1 in the future. Co-Conspirator 2 reported he was going to Washington, DC and he was dropped off back at the location where he

8

was picked up. Co-Conspirator 2 later informed Co-Conspirator 1 that he was staying in Washington, DC and didn't want to come back to Prince William County right now.

28.     At this time, CI-1 asked Co-Conspirator 1 to call NILES to see if he could facilitate a heroin transaction. In CI-1's presence, Co-Conspirator 1 called NILES via FaceTime and asked him if he could assist in obtaining heroin for them. They agreed to meet at a location in Prince William County. Co-Conspirator 1 and CI-1 obtained a hotel room at an area hotel then waited in Co-Conspirator 1's vehicle in the parking lot. A short time later, NILES was observed pulling into the same hotel parking lot. NILES backed his vehicle in next to Co-Conspirator 1's vehicle.

29.     NILES told Co-Conspirator 1 and CI-1 that he would help them out this time, but they would need to exchange phone numbers with Co-Conspirator 3 and go direct with Co-Conspirator 3 in the future. A short time later, a silver Land Rover bearing Maryland registration occupied solely by Co-Conspirator 3 pulled in and parked in the same hotel parking lot. CI-1, Co-Conspirator 1, NILES, and Co-Conspirator 3 all exited their vehicles and entered the hotel.

30.     After introductions were made, CI-1 exchanged phone numbers with Co-Conspirator 3. CI-1 then provided Co-Conspirator 3 with $6900 and purchased approximately 79 grams of heroin. After the transaction, all subjects left the hotel in the vehicles they arrived in.

31.     During this transaction, while NILES was talking to CI-1 and Co-Conspirator 1, law enforcement placed a spoofed phone call to phone number, (202) 899-0228. NILES answered the phone call confirming he was in fact using this telephone number consistent with the prior transaction toll records.

### G. Controlled Purchase of Cocaine from NILES on August 31, 2017

32.    On August 31, 2017 CI-1, at law enforcement direction, arranged to purchase ten (10) ounces of "crack" cocaine from Co-Conspirator 1. Prior to the controlled purchase, law enforcement searched CI-1 and his vehicle and found it to be free of illegal contraband. Law enforcement then provided CI-1 with ATF agent cashier funds, as well as audio recording and transmitting device(s) to conduct the controlled purchase.

33.    In the afternoon hours, law enforcement observed NILES parked at a residence in Prince William County. NILES was further observed departing from the residence followed to a location in Alexandria, VA. After arriving at this location NILES was observed selecting a relatively remote area, which offered a view of any approaching vehicle, and parking there. After a short period of time NILES departed that location, before making a series of turns in the same direction and traveling immediately back to the same parking spot. This behavior is known as "squaring the block" and is often used as a counter surveillance method to ensure a vehicle is not under surveillance.

34.    Prior to meeting with Co-Conspirator 1, CI-1 made a recorded FaceTime call to Co-Conspirator 1. During the FaceTime call, Co-Conspirator 1 and CI-1 agreed to meet at a location in the Eastern District of Virginia. After meeting with Co-Conspirator 1 inside CI-1's vehicle, CI-1 informed Co-Conspirator 1 that he wanted to purchase 10 ounces of crack cocaine. Co-Conspirator 1 stated, "I can get it now." According to CI-1, Co-Conspirator 1 exited his vehicle and placed a call on his cell phone. CI-1 heard Co-Conspirator 1 state to the person he was talking to on the phone "I need 10." According to Co-Conspirator 1's toll records, several phone calls were placed during this time period to (202) 294-2304 (believed to be NILES phone number).

10

35.     At this time, law enforcement observed NILES driving on Interstate 95 South and exit onto Prince William Parkway. NILES then drove to an apartment complex in Prince William County and was observed entering an apartment. During this time, CI-1 drove Co-Conspirator 1 in CI-1's vehicle to a restaurant in Prince William County with Co-Conspirator 1 in the passenger seat and according to CI-1 waited for NILES to deliver 10 ounces of powder cocaine. NILES was then observed exiting an apartment in Prince William County holding a white plastic bag, entering a vehicle and departing the apartment complex. At this time, CI-1 notified law enforcement that NILES was five (5) minutes away. Approximately 7 minutes later, NILES arrived in the area of CI-1 and Co-Conspirator 1.

36.     In the presence of CI-1, Co-Conspirator 1 made a phone call. Co-Conspirator 1 began the call by stating "If you not here, I should pull off this shit is empty as fuck bro. I should've been in the movie theatre where all the cars at my nigga, shit look goofy as hell." CI-1 then offered to move to a better location. Co-Conspirator 1 continued his phone conversation and stated "I'm right here in this Mercedes right here." Co-Conspirator 1 paused then asked "You see me?" Toll records from Co-Conspirator 1's phone number during this time frame show several phone calls were placed during this time period to (202) 294-2304. According to CI-1, Co-Conspirator 1 exited CI-1's vehicle and got into the vehicle with NILES. A few minutes later, law enforcement observed Co-Conspirator 1 exit NILES vehicle holding a white plastic bag and enter CI-1's vehicle. Additionally, CI-1 reported Co-Conspirator 1 used his own money to purchase the cocaine from NILES.

37.     After the transaction, NILES drove to a residence in Prince William County. Approximately six minutes later, a black pickup truck arrived at an address on Cloverdale Road Woodbridge, VA. After parking the black pickup truck, a black male exited the driver's seat of

11

the vehicle and met with NILES. Approximately three minutes later NILES and the unknown male departed from the address on Cloverdale Road inside the black pickup truck.

38.     At this time, Co-Conspirator 1 went into a Big Lots store in Prince William County and according to CI-1 purchased a Pyrex measuring cup, which Co-Conspirator 1 later used to cook crack cocaine. Co-Conspirator 1 then entered CI-1's vehicle and they drove to an apartment complex in Prince William County. After both parties exited the vehicle, law enforcement observed Co-Conspirator 1 carrying a white plastic bag. Co-Conspirator 1 and CI-1 entered an apartment where Co-Conspirator 1 resides. According to CI-1, after entering the apartment, Co-Conspirator 1 placed the white plastic bag on the kitchen counter, removed portions of the cocaine from the clear plastic baggies inside the white plastic bag into various cooking utensils, measured them, added water and cooked the powder cocaine into crack cocaine. Law enforcement has reviewed the audio recordings and can detect background noises consistent with cooking crack, including water coming out of a faucet and mixing items in a glass container.

39.     Approximately ninety (90) minutes after Co-Conspirator 1 and CI arrive, Co-Conspirator 1 and CI-1 exit the apartment. Co-Conspirator 1 was observed by law enforcement carrying a white plastic bag. Co-Conspirator 1 then drove CI-1 to a residence in Prince William County. According to CI-1, Co-Conspirator 1 and CI-1 drove to the residence because the amount of crack cocaine was too large to be weighed on Co-Conspirator 1's scale and Co-Conspirator 1 had access to a bigger scale at a separate residence in Prince William County. After arriving, both parties exited Co-Conspirator 1's vehicle, and entered the residence. While inside, Co-Conspirator 1 and CI-1 weighed the crack cocaine on a digital scale. CI-1 video recorded a white plastic bag containing the crack cocaine being weighed, law enforcement has

reviewed the video and the scale showed a weight of 387 grams. A short time later, CI-1

provided Co-Conspirator 1 with $14, 950.00 for the crack cocaine.

      H.    Use of Location-Based Services to Further the Investigation

      40.    On September 13, 2017, United States Magistrate Judge Michael S. Nachmanoff

of the Eastern District of Virginia, issued a search warrant authorizing the disclosure of location

information for the SUBJECT TELEPHONE NUMBER. The disclosure of location-based

services has enabled law enforcement to determine locations that NILES frequents and therefore

assist agents in identifying locations where NILES meets to conduct his drug trafficking activity.

Since this Court authorized the disclosure of location based services on September 13, 2017,

agents have used location based data in combination with toll records to learn valuable

information regarding suspected criminal acts by NILES.

      41.    More specifically, agents have used location based data to identify NILES's

patterns of movement to locations that are suspected to involve drug trafficking and sales.

According to CI-1, NILES frequently conducts drug transactions in hotel rooms. Location based

data has permitted agents to determine dates and times when NILES is believed to have

frequented local hotels. This also enabled agents to conduct analysis of incoming and outgoing

calls within close proximity to NILES movement to suspected locations. Thus, permitting agents

to possible identify other drug distributors and customers.

      42.    In addition, previous statements by co-conspirators captured by audio recording

devices provided to CI-1, as well as CI-1's personal observation of FaceTime calls between Co-

Conspirator 1 and NILES' drug-related conversations have shown that NILES uses FaceTime on

his cell phone to communicate with higher-level associates within his distribution network about

drug trafficking and sales. CI-1 has stated that NILES' and his co-conspirators use FaceTime to

communicate because it cannot be intercepted by law enforcement. Analysis of incoming and outgoing calls or lack of incoming and outgoing voice calls (FaceTime calls are not captured by a pen register and trap and trace device) in relationship to movements that fall within the pattern of NILES's drug activity, can assist agents in determining the level of importance of the individual NILES is meeting.

43.      Cellular location data also enables agents to cross reference NILES movement in relation to the actions and locations of his co-conspirators. In addition, during the last 30 days, NILES has been discovered to utilize four additional vehicles that were previously unknown to law enforcement. This frequent rotation through five possible vehicles prevents the effective use of the court authorized vehicle tracker. Since learning of the additional vehicles, law enforcement has observed NILES utilizing these vehicles to travel with greater frequency than previously realized, to locations of interest.

44.      NILES is in regular contact with co-conspirators that travel and temporarily reside outside the Eastern District of Virginia. If NILES were to travel to these locations, which are of significant investigative value, it is impossible to predict with accuracy which vehicle NILES would use to drive to these locations. Thus, location based data would very likely be the only method available to agents to identify these locations.

45.      Cell-sites only disclose the location of an Antenna Tower. Like plugging a conventional phone into a "wall-jack," the wireless telecommunications providers quickly and accurately detect which one of their "wall-jack" cell-sites is accessed by a mobile phone; and, armed with knowledge of that cell-site's physical tower location, agents can inferentially approximate the SUBJECT TELEPHONE NUMBER's location, at best to within several square miles, at the beginning and end of each call. This approximated location can be used to

corroborate the observations of surveillance agents and to anticipate future movements and
locations by establishing the target's habit or pattern. For example, if a target's first and last
wireless calls of the day occur in the same cell site, then the geographic footprint of the area
covered by that cell-site should correspond to the general location where the target is residing,
working or sleeping. If there are several known addresses—as identified through subscriber
records derived from the pen/trap or otherwise—in that same cell-site's coverage area, then there
is a good possibility that the target is residing with or visiting one of those individuals.

46.     While the information acquired by cell-site analysis (which is created and stored
in the ordinary course of business each and every time the mobile phone makes or receives a
call) can be coarse and non-specific, information obtained from the telecommunications
providers using their "Enhanced 911" tools (such as GPS fixes, triangulation, cell-site "pings,"
received signal strength indicator (RSSI), and timing offset analysis) can be much more precise.
More precise information allows investigators to get closer to the actual handset. Some of these
E-911 tools are not records that exist in the ordinary course of business and often are not created
unless the user of the phone dials "911." Thus, unless a provider has reason to believe a mobile
phone's user is in distress (typically by virtue of a 911 call), telecommunications providers will
require a court order to create, record, and disclose these electronic records to law enforcement.
I submit that there is probable cause to support a court order to require the creation of these
records and to compel the disclosure of these records. These records, however, are rarely so
precise as to establish the phone's presence in a particular house or apartment and cannot be
relied upon as a sole basis for attempting warrant service at any particular location.

47.     Whether the ATF receives real-time cell-sites or requests the provider disclose
E-911 location information, no government "device" is involved. Rather, cell-site records are

15

passed contemporaneously with pen register and trap and trace data from the accessing cell site

to the local Mobile Telephone Switching, which forwards the information to the Provider's

central collection facility (*i.e.* their law enforcement relations/court order bureau offices).  From

there, the provider authorizes the data stream for release to the ATF through its CALEA-

compliant network.

48.     Similarly, when the ATF requests E-911 tools in an attempt to locate the physical

handset, no government "device" is used.  Rather, the provider will query the phone, which must

be on, to ascertain its location through a two-way data dialogue.  That information is captured

and stored by the provider and passed on to the Investigative Agency orally or in writing (e.g.

email or fax).

49.     Once I receive an order for the type of information requested herein, it is served

upon the SUBJECT TELEPHONE NUMBER's Provider.  Once received, it is catalogued and

assigned to an electronic surveillance representative, who, based on caseload, will "provision"

the SUBJECT TELEPHONE NUMBER for delivery in the appropriate "switches," thereby

instructing those switches to forward the information to the Provider's central collection point.

"Provisioning" can occur at any time and, except for exigent cases, is dictated solely by the

Provider.  Thus, the ATF cannot control whether the Order will be electronically implemented

during day or night.

50.     Revelation of the attempt to locate and investigate NILES through use of the

SUBJECT TELEPHONE NUMBER would greatly compromise our ongoing investigation.  If

alerted to the existence of the ongoing investigation, NILES will likely change patterns, change

phones, resort to other communications media, destroy evidence, and flee.

## CONCLUSION

51.     Based on the facts and circumstances stated above, I submit that there is probable

cause to believe that the above-described drug violations have occurred, are presently occurring,

and will continue to occur; and that NILES has used, is using, and will continue to use the

SUBJECT TELEPHONE NUMBER in furtherance of his illicit drug trafficking, in violation of

Title 21, United States Code, Sections 841(a)(1) and 846.  I further believe that the continued

disclosure of location-based services will permit law enforcement to monitor NILES's

involvement in illegal activities.  Additionally, this order would provide investigating agents the

ability to identify other co-conspirators, sources of supply, and effectively track the movements

of the holder of the SUBJECT TELEPHONE NUMBER.

Jonathan C. Boller
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn and subscribed to before me this ___11___ day of October 2017.

_____/s/_____
Michael S. Nachmanoff
United States Magistrate Judge
The Honorable Michael S. Nachmanoff
United States Magistrate Judge

17